IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| GEORGE HIRAPETIAN,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF CHARLOTTE DEPARTMENT OF TRANSPORTATION<br><br>Defendant. | ) | **COMPLAINT**<br>**JURY TRIAL DEMAND**<br>CIVIL ACTION NO:________________ |

**INTRODUCTION AND JURSIDICTION**

1. This is an action seeking legal relief under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 (e) et seq., ("Title VII"); and the Civil Rights Act of 1990 as amended; and the common law of the State of North Carolina as proscribed in the North Carolina Equal Employment Practices Act, N.C. Gen. Stat. § 143-422.2 ("NCEEPA"). Plaintiff claims arise from national origin discrimination, and retaliation of which he was subjected while employed by the Defendant. Plaintiff experienced national origin discrimination after he applied for many opened position with the Defendant. In fact, he applied for at least 32 to 40 opened position most of which he was not granted an interview. Other employees with the same or similar; and sometimes less, qualifications and experience were not deprived of an equal opportunity to participate in the promotion process. Defendant's retaliatory actions occurred after Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff has been subjected to a retaliatory conduct with an unjustified write-up where the Defendant claims Plaintiff's use of the City's Email System was personal and

unacceptable, when in fact, Plaintiff used the email system to report his discriminatory experiences. Defendant also retaliated against the Plaintiff through a series of denied requests for his superiors to address his concerns of national origin discrimination. In fact, Plaintiff was told by the Human Resources Director for the City of Charlotte that because his claim with the EEOC is pending, it would be inappropriate for him to address Plaintiff's concerns further, or words to that affect. Finally, Plaintiff was subjected also to Defendant's retaliatory conduct when he was terminated on January 20, 2010, for allegedly communicating a threat. In addition to causes of action under federal law, Plaintiff alleges that these actions of the Defendant constitute intentional and negligent infliction of emotional distress and negligent supervision and retention under state law.

2. Jurisdiction of the court is invoked pursuant to 28 U.S.C. § 1343, this being a proceeding seeking to enforce rights and remedies secured under Title VII. Jurisdiction is also conferred upon this court by § 1331 and by 42 U.S.C. § 2000e et seq.

3. Jurisdiction is further invoked pursuant to 28 U.S.C. § 1367, this being an action also challenging Defendant's unlawful acts under the common law and State laws of public policy of the State of North Carolina as proscribed in N. C. Gen. Stat. 143-422.2.

**PARTIES**

4. Plaintiff, George Hirapetian, is of Armenian descent; a United States citizen; and a resident of Charlotte, Mecklenburg County, North Carolina.

5. Defendant, City of Charlotte Department of Transportation ("CDOT"), is a North Carolina municipal corporation organized and existing under the laws of the State of North Carolina; and engaged in the business of providing municipal services to its

citizens in the Charlotte area; and is an employer as defined within the meaning of Title VII.

**STATEMENT OF FACTS**

6. On March 12, 2007, George Hirapetian ("Hirapetian") was hired to work for the CDOT, in the Street Maintenance Division ("SMD") as a Contract Estimator. He holds a master's degree in Civil Engineering.
7. Hirapetian, an Armenian, earned his degree from a foreign country. The Evaluation Service Inc., for International Academic Credential Assessment of Hopewell Junction, NY determined that his studies, however, have "the academic equivalent of a master's degree in civil engineering from a regionally accredited institution in the United States."
8. Hirapetian immediately set a high standard of providing excellent customer service within SMD which management recognized in his annual performance plans.
9. After working for the CDOT for several months, Hirapetian applied for an opened position for which he was qualified. He was not selected for an interview.
10. Hirapetian continued to apply for opened positions none of which granted him an interview. Hirapetian brought this concern to management where he asked why he was not being selected to interview for the opened positions despite his education, qualifications and experience. He was told by management that his education was from a foreign country and is not of the same equivalent of Americans education and his accent and English would hindered his ability to effectively communicate with city management and their customers.
11. Hirapetian continued to apply for many more opened positions during the course of his employment mostly with the same results. In fact, he applied for approximately 32 to 40

opened positions.  Upon information and belief, Hirapetian is better qualified than the individuals who were selected for an interview; and the individuals who were selected to fill the many opened positions during his employment with the CDOT.

12. Upon information and belief, Hirapetian believes that the majority, if not all, the selected individuals that filled the positions are Americans with less education, qualification, and experience than Hirapetian.

13. Hirapetian complained at every level of management that his denial of equal promotion opportunities based on his national origin is discrimination and against his federally protected rights.

14. Hirapetian again applied for an opened position as an Operation Supervisor.  After many complaints, he was finally, granted an interview.  Once the interview was completed, he was again told by management; and an interview panel member; that his education was foreign and his English is not good enough to communicate effectively with management and other customers.

15. Hirapetian, at the time of his employment; provided CDOT with proof of his educational attainment as equivalent to the American educational institutions; however, management refused to recognize his master's degree in civil engineering when considering him for promotions.

16. Hirapetian does have an accent but it does not hinder his ability to be understood.  His English language is fluent and his understanding of the English language is of the highest standard. His English also has never interfered with his ability to communicate effectively with city management or other customers. Nor has management ever complained of his communication skill while during his current job that requires constant

communication; orally; in writing; and in English; with management; and customers. Additionally, management has never complained or evaluated him negatively in the area of communication in his evaluations. The only time Hirapetian's education, accent, and English become an issue is when he applies for opened positions for promotions.

17. On April 22, 2009, Hirapetian filed a charge of discrimination with the EEOC based on national origin discrimination.

18. On May 18, 2009, in retaliation against Hirapetian for filing a charge of discrimination, management held a counseling session with Hirapetian where he was charged with "…unacceptable behavior…communicating disparaging remarks and comments, making false allegations and spreading untruthful information and communicating…personal opinions and allegations to CDOT chain of command and employees all using the City email system."

19. Also during that May 18, 2009, counseling session, Hirapetian refused to sign the memorandum. Management then instructed another member of management, who was present in the office, to close the door. He then turned to Hirapetian, in a very angry tone and while pounding his fist on the desk; demanded that he (Hirapetian) would not leave his office without signing the memorandum.

20. Hirapetian fearing for his physical safety; signed the memorandum and later reported the threatening conduct to the Senior Human Resources Consultant, the only member of management that he was allowed to contact at that time.

21. Hirapetian, however, did not receive a response to his complaint and no action was taken against management for this threatening conduct.

22. Hirapetian had a meeting with the Senior Human Resources Consultant who informed him that he could resume contacting management via email. On July 2, 2009, Hirapetian sent an email to management seeking information concerning the investigation into the threatening conduct of a member of management on May 18, 2009. Although, management for whom it was addressed did not respond, the Senior Human Resources Consultant responded and stated "George, they are aware and it is being addressed." Unfortunately for Hirapetian, management did not address the threatening experience and if they did, management did not inform Hirapetian of its findings.

23. Approximately, 26 days later, on July 28, 2009, Hirapetian sent another email to management for which he was suspended for two (2) days without pay. He was told that he was suspended for insubordination because he was ordered in the May 18, 2009, memorandum, not to contact management again and that Hirapetian only point of contact would be the Senior Human Resources Consultant. However, after the May 18, 2009, memorandum, Hirapetian was told by the Senior Human Resources Consultant that he could resume sending emails to management as evident by the email sent on July 2, 2009, to some of the same members of management without question or reprimand.

24. On or about January 10, 2010, approximately 10 days before being terminated, Hirapetian was granted another interview for Project Manager. Again, he received a call from the hiring manager who stated that his English is not good enough to communicate with city management and other customers.

25. On January 20, 2010, Hirapetian was terminated for allegedly communicating a threat, when in fact; he was once again pleading with management to relief him of his burdensome plight of discrimination which had fallen on deaf ears.

26. Hirapetian requested that management investigate his complaint of national origin discrimination for approximately 2 years or more. Hirapetian did not received a response to his many requests except to say that his concerns were being investigated, however, no one has ever asked him anything about his discrimination claims; he has never received any information about managements alleged investigations or findings, if any; and to his knowledge; no action was ever taken to resolve his claims.

27. All of the above facts were carried out because of Plaintiff's national origin and the fact that he had engaged in activities protected under Title VII.

**FIRST CLAIM FOR RELIEF**
**NATIONAL ORIGIN DISCRIMINATION**

28. Plaintiff re-alleges and incorporates all preceding paragraphs by reference.

29. By the actions described above, the Defendant discriminated against the Plaintiff by imposing unfair, unauthorized, and discriminatory procedures in the promotion process which is a violation of federal law. Similarly situated American, or other nationalities, employees were not subjected to this treatment. In fact, upon information and belief, lesser qualified American employees were selected for promotion to fill the position for which Plaintiff applied and was qualified to fill.

30. Defendant's action and omission was in violation of Title VII entitling Plaintiff to compensatory damages in excess of $10,000.00.

**SECOND CLAIM FOR RELIEF**
**DISCRIMINATION BASED ON ACCENT/ENGLISH**

31. Plaintiff re-alleges and incorporates all preceding paragraphs by reference.

32. By the actions described above, the Defendant discriminated against the Plaintiff by imposing unfair, unauthorized, and discriminatory procedures by denying Plaintiff equal

opportunity to participate and promote because of his accent and English. Defendant's action and omission was in violation of Title VII, entitling Plaintiff to compensation, in excess of $10,000.00.

**THIRD CLAIM FOR RELIEF**
**RETALIATION**

33. Plaintiff re-alleges and incorporates all preceding paragraphs by reference.

34. By the actions described above, Defendant retaliated against Plaintiff due to his complaints of unlawful discrimination on the basis of national origin. Plaintiff complained to CDOT about the unlawful discrimination to which he was subjected by their managerial agents. Plaintiff suffered adverse employment action as a direct result of his complaints to CDOT in the form of discipline and termination.

**FOURTH CLAIM FOR RELIEF**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

35. Plaintiff re-alleges and incorporates all preceding paragraphs by reference.

36. As a result of Defendant's actions, Plaintiff has suffered severe emotional distress and anxiety such that he has endured many sleepless nights and experience great battles with depression.

37. Defendant's actions were extreme and outrage that could foreseeably cause emotional distress to the Plaintiff and in fact did cause severe emotional distress.

38. Defendant's actions caused Plaintiff to suffer severe emotional distress and he is entitled to recover compensatory damages in an amount in excess of $10,000.00.

**FIFTH CLAIM FOR RELIEF**
**NEGLIGENT INFLICTION OF**
**EMOTIONAL DISTRESS**

39. Plaintiff re-alleges and incorporates all preceding paragraphs by reference.

40. As a result of the Defendant's actions, Plaintiff suffered severe emotion distress as a proximate result of the negligence of the Defendant. Defendant owed Plaintiff a duty to use ordinary care to protect him from the discriminatory acts of its managers and employees. Defendant created and maintained a discriminatory work environment by allowing management to prevent Plaintiff from participating in the promotion process.

41. Defendant failed to use that degree of care which a reasonable and prudent employer would use under the same or similar circumstances. Defendant's discriminatory conduct further caused Plaintiff great humiliation, stress and depression.

42. Defendant's actions caused Plaintiff to suffer severe emotional distress and he is entitled to recover compensatory damages in an amount in excess of $10,000.00.

**SIXTH CLAIM FOR RELIEF**
**NEGLIGENT RETENTION AND SUPERVISION**

43. Plaintiff re-alleges and incorporates all preceding paragraphs by reference.

44. Defendant owed a duty to use ordinary care to protect the Plaintiff from oppressive and retaliatory conduct and injury from its managers and employees.

45. Defendant had knowledge of the actions of its managerial employees and agents toward the Plaintiff. Plaintiff reported the discriminatory and retaliatory work conditions to members of management, on many occasions for approximately 2 years or more. Defendant knew or should have known that such work conditions existed for the Plaintiff.

46. Defendant was negligent in failing to take adequate measure to supervise the Plaintiff's superiors and to stop their unlawful mistreatment of the Plaintiff. To the contrary, Defendant shielded the Plaintiff's superiors and other of its agents, thus enabling further discriminatory and retaliatory behavior toward the Plaintiff.

47. Defendant's negligent supervision and retention of the Plaintiff's superiors and of its employees fostered and validated an already oppressive work environment for the Plaintiff, and as a direct and proximate cause of the injuries and harm to the Plaintiff.

48. As a direct result of the negligence of Defendant in retaining and supervising Plaintiff's superiors, and condoning their conduct, Defendant disregard of the protected rights of the Plaintiff, thus entitles him to an award of compensatory damages in excess of $10,000.00.

**SEVENTH CLAIM FOR RELIEF**
**DAMAGES**

49. Plaintiff re-alleges and incorporates all preceding paragraphs by reference.

50. Because of the discrimination claimed herein, Plaintiff has suffered damages, including past, present and future earnings, and benefits, and other monetary and non monetary losses. Plaintiff also suffered and continues to suffer from extreme worry, depression, humiliation, embarrassment, and many sleepless nights.

51. Plaintiff has been and continues to be irrevocably injured by the discriminatory actions complained of herein. The injuries which Plaintiff suffered are and will continue to be irrevocable until enjoined by this court. Plaintiff has no adequate or complete remedy other than this proceeding to have the practice of the Defendant complained of herein remedied.

52. By reason of Defendant's extreme and outrageous conduct, and as a proximate result thereof, the Plaintiff has been damaged in his economic relations, and has suffered other losses in an amount in excess of $10,000.00.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

53. Plaintiff filed timely charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") designated by the EEOC's charge numbers 430-2009-02270 and

430-2010-00846. The EEOC has issued Plaintiff Right-to-Sue letters. Plaintiff filed this action within ninety (90) days of receipt of the Right-to-Sue letters, and has thereby complied with all jurisdictional requirement of Title VII and has exhausted all administrative prerequisites to initiating this proceeding.

**JURY TRIAL DEMANDED**

43. Plaintiff hereby demands a trial by jury of all legal claim asserted herein.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays that the discrimination alleged herein be remedied in full and that the court, after a jury trial:

1. Declare the actions complained of herein to be illegal;
2. Hold the Defendant legally liable for engaging in the unlawful practices set forth herein and any other employment practice shown to be in violation of Title VII;
3. Award the Plaintiff compensatory damages, including damages for distress and mental anguish, pain and suffering, harm to Plaintiff's economic opportunities, back pay with interest, front pay and future loss of earnings with cost of living adjustment, interest, fringe benefits, and retirement benefits;
4. Award Plaintiff his costs and expenses in this action, including reasonable attorney's fees cost and other litigation expenses; and
5. Grant such other and further relief as may be just and necessary to afford complete relief to the Plaintiff.

This 30th day of April, 2010

Respectfully submitted,

/s/ Lena Watts-Robinson
North Carolina State Bar # 35845

Law Office of Lena Watts-Robinson
7701 Sharon Lakes Road, Suite Y
Charlotte, North Carolina 28210
Telephone: 704-552-0888
Facsimile: 704-552-0936
Email: lawofficeoflena@bellsouth.net

Attorney for Plaintiff